Case number 24-7053. Metropolitan Municipality of Lima, Atvalent v. Rutas De Lima S.A.C. Mr. Lane for the Atvalent, Mr. Healy for the Atvalent. Good morning. May it please the court. I'd like to focus on the public policy issue in hopes of bringing some clarity to the substantive and procedural framework for evaluating it. The district court committed a straightforward legal error. The court refused to even engage with Lima's bribery claim, reasoning that the claim was to be determined exclusively by the arbitrators because it focuses on the underlying contract rather than the arbitration award itself. That conclusion is foreclosed by Supreme Court and circuit precedent, including Enron Nigeria, which held that a court's, quote, analysis of the public policy issue extends to the underlying contract. But that error alone, excuse me, that error alone is enough to vacate and remand. But it raises the critical question of what happens next, given that the tribunals found that Lima had not proved the bribery and courts ordinarily defer to arbitrators' factual findings. Enron provides substantive guidance, and this court's decision in the Termo Rio case provides procedural guidance. Federal courts cannot turn a blind eye to evidence showing that the underlying contract was procured through bribery. As Enron declared, the question of whether enforcement of the award should be denied on public policy grounds is a question for the courts to answer. And that independent judgment acquires special force and scope where the underlying contract's origin is criminal. Did Enron give dispositive weight to the arbitrators' actual findings? I don't think it did. It said that the findings would be due significant weight, but it would not doom the challenge if there were evidence to the contrary, that the claim in Enron ultimately failed because they didn't have the facts of the fraud. We have the facts. I think it's critical that Enron emphasizes the longstanding fundamental need of the federal courts to protect their own integrity by ensuring that they do not enforce a contract obtained through bribery or fraud lest they be made party to the criminal act and allow a party to profit by its own fraud or crime. So that's why Enron sets up this idea of, we will give significant weight, but we're going to look at the evidence. And that has to include not only the evidence in the arbitral record, but also any new evidence. Because as Enron also emphasized, and I'm quoting, courts may not elevate the party's contractual choices above the fundamental need of courts to their own integrity. So ultimately, the courts have to make sure for themselves that they are not enforcing a contract that was procured through bribery. I'm at page 290 of Enron, and it says, ICC declined, ICC noted, ICC's determination, ICC credited, ICC found, ICC found, ICC found, ICC was unpersuaded. It just seems like maybe they're not completely deferring 100% to the arbitrator, but boy, it seems like they're giving a ton of weight to the arbitrator's findings. Well, to be sure, a court is going to start with what the arbitrator found, what the record was before the arbitrator, how the arbitrator reasoned through it. In Enron, the arbitrator- Just to be clear, I wasn't quoting from the facts section. This is the final analysis section. I understand. In Enron, the court is explaining that the analysis of the arbitrators was supported by the evidence, and there's no evidence to the contrary. The court says at two, I think it's, I don't have the page, but the court says at one point, the ICC's findings to which an enforcing court owes substantial deference, doomed Nigeria's public policy defense in the absence of evidence or equities warranting the piercing of Enron's corporate veil. It would have allowed a different result if the evidence supported a different result. Where in the opinion does it re-examine even a single factual finding? Well, I think that's what it's doing. In the parts that you're reading, I think that's what it's actually doing, but it's saying, in effect, these are good findings. The evidence is there. The analysis is there. We don't see a problem with it. We don't have evidence to disagree with it. Whereas here, in our case, we have substantial evidence to the contrary. In fact, I would say overwhelming evidence that Rutas and its parent, Odebrecht, secured, expanded, and preserved the concession contract through bribery. Rutas doesn't deny that Odebrecht's bribe department made secret illegal payments to Vioron's campaigns while the base contract and the addendum were being negotiated. Both the arbitrators and the district court disagreed with that. They did. Well, I'm not sure I'm following your argument. What's impermissible about the arbitrators saying, we don't see any evidence to support your claim of violation of public policy or bribery or whatever you're calling it, and the court says at great length, I've gone through all of those findings, and they seem correct to me. The district court here, I'm sorry, the district court did not do that. The district court did do that. No. I just read the opinion again last night. The district court went through and said, the arbitrators found, and I don't disagree with it, the arbitrators found is, those claims are not supported. The district court said when it addressed the public policy defense at JA 1241. No, I understand that the district court said that's a determination for the arbitrators, but the district court along the way has to satisfy herself that there's nothing here that would warrant her tossing this out. The district court did, in fact, put the public policy question however she stated. I don't think it's, I don't know whether it's right or wrong. It doesn't matter. The point for me is that district court went through both panels, the determinations, and explained how one affected the other, in effect to say, I don't find support for the claim that is being made here with respect to a violation of public policy. She was saying that. I don't know how well she'll read her opinion to say it. What do you think she would say? She agreed? What was she saying? I don't know. I think there's a problem but I have to defer to their judgment. Respectfully, your honor, I don't think she did that at all. You think that's what she did? No, because I think that what she, to the extent that she discussed the facts at all, she did it in the context of the fraud claim. And what she said was, she said there are problems. She perceived problems with the evidence as a matter of, for example, hearsay or incomplete transcripts in that nature. She said, I am not going to, this is called a ramshackle record, which I think is an overstated criticism. But she said, I'm not going to allow evidentiary proceedings to try to address the evidentiary concerns because I can't do that given that I am not allowed to review an arbitrator's termination as to bribery. The court never actually assessed, even on the arbitrator's own records, whether they were sound decisions. I mean, the second tribunal, for example, it makes certain criticisms. It doesn't believe there was any motive to bribe to get the contract after the contract had been awarded. It doesn't believe there was a motive to get the addendum because it was contemplated by the original proposal. But the evidence before the tribunal- You think the district court was struggling with those findings? I don't think the district court actually considered those findings. I don't think that's in the opinion. You must have read two different things. The district court went through all of it and said, no, and then said, no, it took it all the way through and said, I'm not seeing it. The district court addressed many, it's a long opinion, addresses a lot of different claims. When it comes to the findings of bribery, all it says is, I have concerns about the evidence. I can't conduct proceedings to address those concerns because this is exclusively for the And I think that even if the court is going to limit itself to the arbitral's record, it has to actually examine whether the arbitrator's findings are actually supported by the record. And we don't think that's true for the reasons we stated in Armbrave. I would like to turn very quickly to our final argument that the second tribunal erred in excluding the annex. And I would just like to emphasize that I think the key question is whether Lima actually requested that the annex be included. The best evidence to see that it did is the tribunal's own order, which says that it refused to open a new stage for the production of documents, plural, which certainly goes beyond the indictment. And it authorized Lima to submit only certain parts of the indictment, quote, without additional annexes. And Rudess's final opposition to the request similarly said that Lima's request, quote, implicates submitting the complete prosecutorial file with all its annexes. I don't think there's a basis to say that the tribunal, that Lima hadn't made the request for the annex. It's a little odd that your evidence that Lima requested more does not include anything Lima said. Right. Well, Lima, I mean, we go over this in the briefs, but Lima says it wants to submit all the documents that it's received from the prosecutor. The district court didn't buy that. No, but this is a paper record. I mean, I'm wondering what you're reading. The district court, that's an example of something. The district court specifically went through that and said, no, that's not the way it played out. Lima's wrong. And we disagree with the district court. That's a different question. Well, the evidence here... That the district court didn't do anything. On that issue, no, I agree. The district court did address that issue. I'm saying as to the facts about bribery, the district court did not address that. On this issue, the district court did, but the record is right there in the documents, and I think the district court got it wrong. What's your best quote of something Lima said at the second arbitration that shows it requested to submit the annex rather than just the indictment? Give me one second. Well, I don't have the citations, but they're in our brief, but Lima multiple times used the word documents in its request. In its request for reconsideration of the denial, it spoke of new evidence. Instead, it had obtained the documents it wishes to incorporate. That's a 349 to 50 in the JA. It's talking about the documents it received from the prosecutor. It didn't fully explain what all these documents were. It goes down to using the plural, or something? In Lima's papers, it uses the plural in the context of talking about the package of materials that it received from the prosecutors. I think you get more explication that that includes the annex from Rutas' opposition and the tribunal's order. Lima's paper submissions don't actually use the word annex, I don't believe. And what was accepted? Only the indictment, or what we call the information. A portion of it was allowed to be submitted, but not the underlying evidence. I understand that, but you're saying one document? Part of one document. Part of one document. Yes. You said a portion, but you mean portions? Portions relating to a specific topic were allowed to be introduced. But then the problem is that the tribunal then said, well, we can't believe that because we don't have the underlying evidence to corroborate. This is just the prosecutor's allegations. We need the documents. We need the transcripts that they're relying on. That's what was in the annex that the tribunal had excluded. Did the indictment contain the key excerpts from the annex? The indictment, yes. I mean, it either quoted or reproduced evidence in the annex, which the tribunal reviewed, but said, we can't rely on this because just as a court could not take the prosecutor's word for it, we have to see the evidence. I thought that the annex would have still been just more of the prosecutor's word. In other words, if the problem with the 500 pages of excerpts from the indictment is that the 500 pages were one-sided, I'm not sure you solved that problem by submitting even more pages that are one-sided. Well, I don't think the tribunal said the problem is it's one-sided. And the tribunal was saying the problem is it's just a characterization by the prosecutor. If we had the documents... They were quite specific about a number of problems though, right? That they were elaborating on being just a characterization, that they were not sworn, that they were not subject to cross-examination, two or three other observations like that. It was an informal, essentially, document, not a court-approved document. I think those are actually more the district court's concerns. The tribunal... I thought it was parroting the... Well, there's a little bit of a difference. The tribunal focuses on the fact that the witness statements were not what's called corroborated. So they're sort of proffers of... There's sort of a statement and to get... It's a formal process in Peru. As cooperating witnesses, they make a statement. They get benefits as a defendant if their statement is corroborated by the prosecutors. And at the time of the arbitration, those statements hadn't been corroborated by the prosecutors, but they did actually corroborate each other. And there actually were papered documents that corroborated the testimony. So if you step outside that formalistic process in Peru and look at the actual evidence, there was corroboration. That corroboration was in the annex and that's what the tribunal excluded. That's why it's a problem, but it would have actually addressed the tribunal's concerns about the lack of corroboration in the documents. I don't think the tribunal raised... The tribunal itself would have had to make a determination based on the annex that the allegations were corroborated. Yes, which it was basically saying it was going to do. It was saying, we have to make these evaluations, factual evaluations for ourselves. We need the evidence to do that. MML tried to give the evidence, it rejected the evidence, and then it said, well, we can't... And then the next tribunal says, okay, now we've seen the evidence. It didn't affect anything. The tribunal never actually looked at the evidence. They never saw the annex. They only had the indictment. Okay. So none of this was available to the first tribunal. Oh, correct. It didn't come up until late in the second process, right after the close of the discovery in the second tribunal. Thank you. I'll give you a couple minutes, a few minutes on the button. Thank you. Good morning. David Hilley, Verutas de Lima, may it please the court. Let me pick up where we left off, if I may, with respect to the annex. First, there is no question that the annex was never requested to be submitted by Lima. Lima's request is set forth at JA 347 through 352. There is not a mention of an annex, an indictment, or an indictment. Supplement, nothing. They refer to the prosecutorial indictment only. They're the ones that had it. Nobody else had it. You just heard Mr. Lane say they asked for documents, plural. And, you know, I can kind of see how you might think of the indictment as one document. So it seems like, you know, his argument is they had to have been asking for more than the indictment or else the S wouldn't have been on the word document. But the arbitrators didn't know there was an annex. Whether they used the word, documents. I mean, if you look at their request, it says prosecutorial indictment numerous times throughout it. That's what they asked for. They never used the word annex. So when the arbitrators said, you can submit whatever pages you want. Just don't give us any extra annexes or writing. I submit that's because the arbitrators hadn't yet concluded whether they were going to allow the 10-page supplemental brief that they later said that they could do also. It had nothing to do with the annexes to the indictment. They didn't know there was an annex to the indictment. They could not have been referring to that. And let's also not forget the context in which this arose. This is seven months after the hearing on the merits had been completed. The arbitrators deliberating, preparing their award. And Lima comes in and says, hey, there's a press report about an indictment. And we want to put that into the record. The arbitrators who had control over the process of the hearing, what evidence comes in and when under the UNSA trial rules could have said, no, it's too late. But they didn't and said, give us the index, whatever pages you want. They chose 500 pages. And to go to your question, Judge Walker, they absolutely had excerpts of the testimony, presumably the best ones that the prosecutor selected in the indictment itself. So there's just no, and the district court reviewed this thoroughly and concluded that the extra information in the excerpts doesn't change anything. Let me go back. Just so you're on the record on the public policy, I understand what the other side is arguing. But I think the district court statement is somewhat confusing here because there's an overlap between vacating on public policy grounds and vacating on statutory grounds. They're not distinct. In other words, some of the statutory grounds can be seen to subsume public policy grounds. Do you disagree with that? By the statutory grounds, you're referring to the FAA and the convention? Yeah. Well, the convention has the express reference to public policy, so for sure it's included there, Your Honor. And otherwise? In other words, I don't see them as, it's an interesting legal argument we've developed since the Supreme Court made its observation about you stick with the statutory grounds and that's it. But there are public policy grounds that are being stated in the name of statutory grounds here as I read the district court's decision. I'm just curious to see if you want to weigh in on it. And that's why I read what she said, but then I read all the findings that she is endorsing. And to me, I don't know how that can become an error, whatever you may think the Supreme Court meant to say, because to the extent that the nature of the corruption and alleged bribery, et cetera, alleged corruption, alleged bribery are there to be considered, she considered it, and those are public policy type questions, right? I think I'm following you, Your Honor. Look, there were claims under the FAA, there were claims under the New York convention. There's a dispute or an open question as to whether under the FAA, public policy non-expressly stated in the provisions of the FAA, whether it's still a valid basis for vacatur. We submit that it's not and that it shouldn't be, we should be limited to the statutory things. But there's no question that the court and we have to deal with public policy anyway, because it is a basis for non-confirmation under the New York convention. So she dealt with it, I think the district court dealt with it, recognizing that it had to deal with it one way or another, and I think dealt with it extremely thoroughly. And so on the public policy issue, Your Honor, so I want to be very clear here. The deference given to arbitrators in the context of public policy, when what the arbitrators actually considered evidence on and ruled on is extreme, if not absolutely complete. Judge Walker, I was focused on the same exact page of the Enron decision, as you highlighted, 290, which showed all the ways in which they defer to the ICC arbitration. And on page 291, this court said the question before the enforcing court is limited, quote, the district court had no choice. And that's really true. That's the way arbitration works in the context of public policy. When the arbitrators have been seized with the question of here whether corruption exists or whatever the public policy may be, and they make the decision, that is what the courts rely on. They don't go behind it. In fact, the U.S. Supreme Court in the United Paper Workers case where the Fifth Circuit had declined to confirm an award, it was an employee at a paper manufacturing facility who had been caught smoking marijuana on the grounds. The arbitrator said, well, I don't think he should have been fired because it wasn't clear. The Fifth Circuit said, no, that's against the public policy of operating dangerous equipment while under the influence of drugs. The U.S. Supreme Court said the parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper, that was the employee, and to be familiar with the plan and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. And here, there's no question that the arbitrators considered all the evidence and gave a detailed analysis. In the first arbitration award, over 20 pages are dedicated to the corruption question. That's JA 445 to 465. In the second award, 63 pages. That's JA 141 to 204. And both tribunals came to the same conclusion that there was no connection between any payments that may have been made and the concession contract here. And that was, they spelled out their logic, the difficulties with the timing that made no sense. When these alleged payments were made, the contract had already been awarded. Why would somebody pay for a contract, a project that had already been awarded? And for the subsequent contracts, like the bankability addendum and the memorandums of agreement, there were those documents simply carried forward what was already in the concession contract. There was no new benefits that came with those. So again, why would anybody make payments to get something they were already entitled to? Everything that was allegedly within the compass of violating public policy presented by the other side was considered by the arbitration panels. And the district court confirmed, even though the district court said, I'm not going to decide public policy, the district court was confirming the findings of the arbitration panels, right? That's absolutely right, your honor. That's why I think there's confusion as to how she wrote it. I understand the claim being made, but it seemed to me on this record, everything within the compass of public policy, arguably, was considered unresolved. It was, your honor. And in the proceedings below, Lima was much more focused on a fraud-based argument. The public policy argument was not the sharp focus as it is on this appeal. Now, the judge, of course, dealt with all of it, but she discussed what the arbitrators had found in the context of the fraud claim, which they are now no longer pursuing in this court. Did the district court re-examine the arbitrators' factual findings about the underlying contract? I believe that the court examined all of those findings and observed and, to my reading, agreed with the problems of the logic of Lima's claim, the timing of when these payments were made, the fact that no new benefits were given subsequently, something that they weren't already entitled to under the project. So, yes, I believe that the district court did review those conclusions, certainly stated no disagreement with them, and my reading of the decision is that she agreed with them. Now, the other side, I have it straight in my head, the other side is not, because this becomes crucial in this case, the other side is not disputing the timing. In other words, the arbitrator's statement of, well, this occurred on this date, it couldn't have been fraud when something occurred well after that. That happened several times, right? That's right, your honor. The other side is not disputing the conclusion they may not like, but the district court said, yeah, look, this is what the findings were. They're not disputed. Those timing sequences are not disputed, and she was essentially agreeing, you can't really have a serious claim of corruption or fraud if those timing sequences are right, and I think they're right. That's right, your honor. Now, they try to emphasize to a greater degree on this appeal alleged payments that were made in 2010, and that was to Lourdes Flores, who was a candidate for mayor. Now, she wasn't the mayor, she was a candidate, and she didn't win the election, she lost it, and the suggestion is that somehow a payment to a mayoral candidate in 2010 had some impact on the municipal council in 2012 in approving, but the arbitrator said, look, that's just, they assessed this as well, and they just said, look, there's no way for us to link that, there's never been any investigation of anybody on the municipal council, this just doesn't make sense. So the timing didn't work throughout for the arbitrators, the district court reviewed it, didn't express any disagreement with that analysis, and what Lima is doing is asking this court to give it yet another do-over, and they're just not entitled to that under the law of enforcing arbitration awards in the United States, and the strong public policy in favor of finality and enforcement of foreign arbitration awards. I can touch very quickly on the on the document request issue, if the court would like me to. Good. Do you have any more questions? No. Do you have any more questions? No, I think we're good. Thank you, thank you. Maybe we'll do three minutes, please. A few break points. First, to Judge Edwards. I reviewed the opinion while I was sitting there. I would refer you to pages 1230 to 1234 of the JA. This is where the judge addresses the fraud claim, and in that context, she talks about a mulligan, or the new evidence, what the findings were on the policy defense. There is not a word in which she says that the findings were well supported. She makes two points. One, I cannot consider public policy defense because it's exclusively for the arbitrators. Two, I cannot consider the new evidence because I have evidentiary concerns about it, and I can't address those concerns because, again, this is exclusively for the arbitrators. You said that she didn't say a single word that the findings were well supported. Did Enron say a single word that the findings were well supported? Enron went through the process of assessing it and found that they were well supported. She didn't even do that. Where did Enron say the findings are well supported? I think the passages that you were quoting me earlier are what's doing that. That's the only way to understand that, I think, in light of the other language in Enron, that gives significant weight to the findings unless there's evidence in the absence of contrary evidence. Usually, when we're reviewing findings from another court or tribunal agency, we would say the agency found X, and that finding is supported because. But Enron seems to just say the tribunal found X, period. Then it says the tribunal found something else, period, on and on and on. I think that's because it was a clear-cut case. The only way to square that framing of the discussion with everything that preceded it, as Enron set up the analysis, the need to preserve your integrity, you can't elevate the party's contractual choices above that need, and so on. The only way to square that is to say the court was looking at that record and saying, this looks pretty good. We really don't have any reason to disagree with this. United Paperworkers, which the other side just quoted, yes, it says we don't do fact-finding in public policy cases, but that did not involve the kind of problem that Enron is talking about, where the underlying contract is criminal. That creates the fundamental need to investigate, to ensure the integrity of the courts. That was not implicated in United Paperworkers. The final point I want to make briefly is about this timing issue. Timing doesn't matter for bribery. You can pay before, you can pay after. It doesn't matter. Here, the evidence is pretty strong that even though the payments came after the contract was awarded, the agreement for the financing was agreed to before the addendum was negotiated and signed. We have testimony from participants in both sides, Castro for MML and I think Barada for Odebrecht, saying that Odebrecht was afraid it would lose the contract, afraid it might not be signed, afraid it might be terminated. The city had termination rights in the contract. There was a real risk, and they needed to lock it down. They needed to lock down MML's support for financing, and they wanted to extend the benefits. That's what the addendum does, which Castro says explicitly was done in exchange for contributions to the Enron's campaign. A lot of it's in the annex, but actually the second tribunal acknowledged all these points. It just didn't want to credit them because it didn't have the underlying evidence to back it up. Thank you. Thank you.
judges: Walker; Edwards; Ginsburg